Filed 5/21/15  P. v. Ramos CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B254651 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA070899) |
| v. | |
| ARTHUR RAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Katherine Mader, Judge.  Corrected and Affirmed.

Leslie Conrad, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Keith H. Borjon and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Arthur Ramos was convicted, following a jury trial, of the first degree murder of Nelson Salazar in violation Penal Code section 187, subdivision (a) and the attempted willful deliberate and premeditated murders of Haley McEntire and Luis David Rosales in violation of sections 664 and 187. Appellant was also convicted of one count of possession of a firearm by a felon in violation of section 12021, subdivision (a)(1). The jury found true the allegations that in the commission of the murder and attempted murders, appellant personally and intentionally discharged a firearm and caused great bodily injury and death within the meaning of section 12022.53, subdivisions (b) through (d). The jury also found true the allegation that appellant committed the offenses for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). The jury acquitted codefendants Maria Rojas and Anthony Vargas of all charges.

Appellant appeals from the judgment of conviction, contending that there is insufficient evidence to support his attempted murder convictions and the gang enhancements. Appellant also contends the trial court erred in denying his motion for a new trial on the ground that the verdict was contrary to the law because the witnesses were not credible. Respondent contends the abstract of judgment must be corrected to reflect the sentences imposed for the attempted murder convictions.

Facts

In the early evening of December 20, 2009, seven members of the Criminals For Life ("CFL") gang were standing in front of an apartment building at 8524 Beverlywood Street in West Los Angeles. According to McEntire, the group consisted of herself, Rodrigo Cortez, Salazar, Ernesto Garcia, "Nancy," Jonathan Flores and Luis David Rosales. Cortez lived in the building. Several members of the group noticed a man wearing a hooded sweatshirt writing on a wall about half a block away. Cortez, Garcia

2

and Nancy started walking toward the person to investigate.[1] As they approached the person, Cortez heard gunshots and returned to his apartment building.

The shots were fired at the group remaining in front of Cortez's building, which consisted of Salazar, McEntire, Rosales and Flores. Salazar was hit in the chest and died. McEntire was hit in the leg and survived, as did Rosales, who was hit in the foot. Flores was not hit. McEntire heard four gunshots, while Cortez's mother Marta Romero heard five gunshots.

McEntire was afraid of retaliation and initially claimed to have not seen anything, but she later identified appellant as the shooter. She knew appellant because they had previously lived in the same apartment building. Appellant is a member of the Down Insane Mexicans ("DIM") gang. DIM and CFL are rivals. Appellant fled the area after the shootings.

In the course of their investigation, Detectives Behnke and Cruz spoke with DIM gang member Matthew Almodovar.[2] He stated that codefendant Rojas told him Salazar (Darky), a CFL gang member, had pointed a gun at her and threatened to kill her and had made disparaging remarks about DIM. Rojas was Almodovar's cousin and appellant's girlfriend. Almodovar's conversation with Rojas took place about December 13, 2009.

Detectives Behnke and Spear interviewed Ramiro Herrera, who hung out with DIM gang members and was friends with appellant. They did not believe Herrera's initial story, and reminded him that because he was on probation, he had a duty to

---

[1]   Cortez identified five people in the original group: himself, McEntire, Rosales, Salazar and Garcia. According to Cortez, he and Garcia walked over to investigate the hooded man. This account would leave McEntire, Rosales and Salazar in front of the building.

At the time of trial, Cortez was serving time in prison on another matter and was a reluctant witness in this case, denying being present before or during the shooting. His account of events comes from his prior inconsistent statements to police.

[2]   Almodovar had a pending case when he spoke with the detectives. Detective Behnke offered to state that Almodovar was very honest, forthcoming and helpful in this case. Ultimately, Almodovar was placed on probation for one year, with no consideration for his cooperation in this case.

3

cooperate with all police inquiries. He told police that on December 20, 2009 he was hanging out with appellant, Rojas, and codefendant Vargas in front of some apartments on Garth Street in West Los Angeles. They were smoking "weed." Rojas told appellant that Salazar was "over there" and/or that "there were some CFL's at the gas station." Appellant said, "We're going to bust a mission." Herrera understood this to mean that appellant was going to kill someone. According to Herrera, appellant and Vargas walked toward the 10 Freeway and Herrera and Rojas went home. Appellant had a silver revolver in his possession.

Herrera heard two to three gunshots and returned to Garth Street. He met Rojas there. Appellant and Vargas showed up 15 minutes later. Appellant stated that he had killed or "smoked" Darky. Appellant received a phone call, and also told the caller that he had just killed Darky who now "was twitching on the ground."

According to Almodovar, Rojas called him on December 21, 2009 and stated "we got rid of Darky." Rojas said that she and appellant had walked to Beverlywood, observed a group of people and noticed that they were CFL gang members. Appellant told Rojas to stand aside and he fired into the crowd. Salazar and a woman were hit. Rojas said that co-defendant Anthony Vargas was present during the shooting, and that they were standing under a bridge at the time of the shooting. Rojas said she and appellant had fled to Riverside because police were all over the place.

Almodovar gave police cell phone numbers for Rojas, appellant and another DIM gang member. Police were able to track appellant and Rojas through their cell phones. Appellant was arrested on January 13, 2010 and Rojas was arrested on January 19, 2010.

Los Angeles County Sheriff's Deputy Richard Sanchez reviewed cell phone records for the two numbers Almodovar gave police. The subscriber for 310-689-4197 was Arturo Ramos. The subscriber for 310-806-8032 was Jonathan Navarro. Rojas had a child with Navarro and had taken the phone from him months earlier.

The records for the Ramos phone showed an outbound call on December 20, 2009 at 6:10 p.m. which used a cell phone tower about .61 miles from the murder scene and an outbound call at 6:36 p.m. which used a cell phone tower about .95 miles from the

4

murder scene.  The records for the Rojas/Navarro phone showed an outbound call on December 20, 2009 at 5:20 p.m., another outbound call at 7:02 p.m. and an inbound call at 10:08 p.m., all using a cell tower about .61 miles from the crime scene.

At trial, Los Angeles Police Officer Wesley Ikeda testified that in June, 2008 appellant told the officer he belonged to DIM.  Officer Ikeda documented his encounter with appellant in a field identification ("FI") card.  LAPD Officer Attila Kreidl testified that in May, 2009 Vargas told the officer he belonged to DIM.  In November, 2009 Vargas told Officer Kreidl that he just hung out with DIM gang members.  Officer Kreidl documented the encounters in FI cards.

At trial, LAPD Officer Lester Dysim testified as a gang expert.  Officer Dysim was assigned to the gang enforcement detail at the West Los Angeles station, and was specifically assigned to monitor DIM.

Most of Officer Dysim's information about DIM came from prior gang officers and more senior officers.  He then went out in the field to corroborate what he learned from the senior officers.  Officer Dysim had spoken to five to nine of the forty DIM members, had been involved in investigations of crimes which DIM members were suspected to have committed, participated in the execution of search warrants at the residences of DIM members and seen graffiti for DIM.  He read FI cards created by other officers, read reports by other police officers about crimes suspected to have been committed by DIM members and met with police officers from surrounding municipalities such as Santa Monica and Culver City about gang issues.

Officer Dysim opined that the primary activities of DIM were "assault with a deadly weapon, robberies, [and] vandalism, [both] misdemeanor and felony."  In addition to learning of DIM's criminal activities from other officers, Officer Dysim had researched the crime reports for DIM through "our database" and found under 100 reports for the past five years.  Robberies were more common than shoplifting in those reports.  Officer Dysim had personally observed gang graffiti, which is a form of vandalism.  Officer Dysim also testified that in 2009, there was a feud between DIM and

5

CFL and they were "taking turns" shooting at each other, which is assault with a deadly weapon.

In 2009, DIM's main rival was CFL. Members of both gangs were "taking turns" shooting at each other. The shooting in this case took place in territory claimed by CFL. A DIM member could move up through the gang hierarchy by committing violent crimes, and killing a member of a rival gang would have a major effect on gang status.

Officer Dysim opined that appellant and Vargas were self-admitted DIM members and Rojas was an associate of DIM. Salazar, Cortez, McEntire, Flores and Garcia were self-admitted members of CFL.

Based on a hypothetical that assumed the facts of the shooting in this case, Officer Dysim opined that the shooting benefitted DIM by eliminating a rival gang member and instilling fear in the community. This fear would result in fewer people reporting crimes which would give DIM the ability to commit more crimes without being caught. Officer Dysim further opined that the shooter committed the crime in association with another DIM gang member, who facilitated the crime by writing on a wall and creating a distraction. The writing also helped to validate that the shooting took place. The action of the DIM associate who reported the location of CFL members also facilitated the commission of the crime.

Discussion

1. Sufficiency of the evidence – attempted murder

Appellant contends there is no evidence to show that he specifically intended to kill McEntire and Rosales and that the prosecutor did not argue this theory to the jury. He concludes that the jury must have convicted him under the kill zone theory, with Salazar being the primary target. He contends there is insufficient evidence to support that theory. Appellant is mistaken.

6

a. Sufficiency

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] [I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

b. Specific intent to kill

Contrary to appellant's claim, the prosecutor did argue that appellant had the specific intent to kill McEntire and Rosales. Her primary theory was that appellant "intended to kill all the victims who were standing on the sidewalk." She argued, "I think the evidence is very clear that it was during this time period that both gangs were taking turns trying to kill each other. [¶] And so the evidence shows that the goal was to kill every CFL person on that sidewalk." There is substantial evidence to support this theory.

Viewing the evidence in the light most favorable to the conviction, Herrera testified that Rojas told appellant that "there were some CFL's at the gas station." Appellant immediately said, "We're gonna bust a mission." "Bust a mission" is a "street" way of saying he intended to kill someone. According to Herrera, appellant and Vargas left on foot toward the 10 Freeway. According to Rojas, she walked with appellant to Beverlywood Street, where they observed a group of people and noticed they were CFL gang members. Appellant began shooting.

7

According to McEntire, the CFL gang members standing together at the time of the shooting were herself, Salazar, Rosales, and Flores. In Cortez's account, McEntire, Salazar and Rosales were in front of his apartment building when the shooting began. In McEntire's account four shots were fired at four people. Other testimony showed that five shots were fired at three people.

This evidence supports a reasonable inference that appellant intended to kill everyone in the group in front of Cortez's house. In response to Rojas's initial mention of a group of CFL gang members, appellant expressly stated his intention to "bust a mission," that is, his intent to kill.

When Rojas and appellant saw the group on Beverlywood, Rojas stated they noticed the group consisted of CFL gang members. Throughout 2009, the two gangs had been shooting back and forth at each other. A member of CFL had recently disparaged DIM. Thus, appellant clearly had a gang-related motive to kill CFL gang members. (See *People v. Smith* (2005) 37 Cal.4th 733, 741 [evidence of motive is often probative of intent to kill].)

When appellant began firing, there were three or four people in front of the house.[3] As is detailed above, appellant fired four to five shots, hitting three people. The numerical equivalency of shots fired to potential victims supports an inference that appellant intended to kill all the people in the group. The fact that appellant only killed one person is not dispositive. (See *People v. Smith, supra,* 37 Cal.4th at p. 741 ["fact that the victim may have escaped death because of the shooter's poor marksmanship [does not] necessarily establish a less culpable state of mind"].)

---

[3] Appellant contends he fired into a crowd of eight people. At no point did anyone testify that there were eight people in front of the house. Appellant may have arrived at this number by adding an individual named "Frank" to the group identified by McEntire. Cortez's mother initially testified that "Frank" was one of six people in the group talking outside the building at some point before the shooting, although she almost immediately said she misunderstood and only Cortez and Salazar were in front of the building. However, even taking her initial testimony as true, she was not looking outside when the shots were fired. Her testimony is not evidence of the number of people remaining in front of the building at that time.

c. Kill zone theory

The prosecutor's secondary theory was the kill zone theory. The prosecutor told jurors that if they believed appellant primarily intended to kill Salazar, "you also have to find that he intended to kill [Haley] McEntire and Luis Rosales. This is when the kill-zone concept comes in." The prosecutor explained under this concept "a person may intend to kill a specific victim or victims and at the same time intend to kill anyone in the particular zone of harm or kill zone." Thus, the prosecutor argued, appellant's act of "shooting at a crowd of people, shooting repeatedly" would permit the jury to "infer that there was a [concurrent] intent to kill" McEntire and Rosales. The prosecutor referred the jury to the instruction on the kill zone theory, CALCRIM No. 600. This instruction told the jury that the People must prove that appellant "not only intended to kill Nelson Salazar but also either intended to kill Hayley McEntire and/or Luis Rosales, or intended to kill everyone in the kill zone."[4]

Appellant contends the manner of the shooting (both the low number of bullets and the minor injuries to the victims) does not support an inference that his use of force was designed and intended to kill everyone in the area around Salazar as a means of killing his target. Although there are kill zone cases where concurrent intent is inferred from the very large number of bullets fired (*People v. Vang* (2001) 87 Cal.App.4th 554, 556-558) or the shooter's marksmanship (see *People v. Smith, supra*, 37 Cal.4th at pp. 742-743 [one high–powered round fired at mother and infant narrowly missing both]), nothing in the kill zone theory requires these specific facts.

Here, there was evidence that it was not easy for a known DIM gang member to walk around in CFL territory to look for CFL gang members to shoot. It would be

---

[4]     Both parties note that the kill zone theory in this case is based on the holding of *People v. McCloud* (2012) 211 Cal.App.4th 788, and that the California Supreme Court has recently granted review of *People v. Canizales* (S217860, review granted June 25, 2104), a case which is critical of *McCloud*. They each draw opposite conclusions from this development. We will assume for the sake of argument that *McCloud* is correct, as is the standard jury instruction which has the same requirements as *McCloud*.

9

reasonable to infer that appellant did not want to miss his opportunity to kill Salazar and decided to kill everyone around him, especially since appellant fired about the same number of bullets as there were targets. Further supporting this inference is the fact that appellant recognized Salazar's companions as rival gang members.

      2. Sufficiency of the evidence – gang enhancement

Appellant contends there is insufficient evidence to show that DIM had as its primary activity the commission of crimes enumerated in section 186.22, subdivision (e) and so insufficient evidence to support the true finding on the section 186.22 gang allegation. There is sufficient evidence.

We review the sufficiency of the evidence in accordance with the principals set forth in section 1 above. (*People v. Nelson, supra,* 51 Cal.4th at p. 210.)

"Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in *People v. Gardeley*, (1996) 14 Cal.4th 605. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on "his personal investigations of hundreds of crimes committed by gang members," together with information from colleagues in his own police department and other law enforcement agencies. (*Gardeley, supra*, at p. 620.)" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.)

Here, Dysim testified as an expert that the primary activities of DIM were "assault with a deadly weapon, robberies, [and] vandalism, [both] misdemeanor and felony" and also "attempted murder and murder." Appellant contends that Dysim did not give the basis for his opinion, and so it cannot be known if it was based on reliable information or not.

On direct examination, Dysim explained the basis for his knowledge of the DIM gang generally. Dysim had spoken to 12 percent to 22 percent of the DIM members, had been involved in investigations of crimes which DIM members were suspected to have committed, participated in the execution of search warrants at the residences of DIM members and seen graffiti for DIM. He read reports by other police officers about crimes suspected to have been committed by DIM members and had met with police officers from surrounding municipalities such as Santa Monica and Culver City about gang issues. The prosecutor did not elicit an express statement from Dysim that these were the sources of his opinion on DIM's primary activities. However, it would be reasonable to infer that they were.

Further, assuming there was a missing link between Dysim's opinion and the basis of his opinion, a link was provided on cross-examination when D. Kelly asked Dysim a series of questions about "where you get most of the information that you rely upon in forming your opinions about gangs and gang activities." Dysim explained that most of his information came from "prior gang officers and more senior, tenured officers." Dysim agreed that he then went out in the field and tried to corroborate what he learned from the senior officers, by talking to gang members. After verifying that Dysim remembered his testimony on direct about primary activities, D. Kelly asked if he was familiar with and had researched the crime reports for DIM for the past five years. Dysim replied that he had researched them through "our database" and there were under 100 for the past 5 years. Although Dysim did not recall the total number of any particular crime committed by DIM members, he did state that robberies were more common than shoplifting but that misdemeanor graffiti offenses were more common than murders.

Thus, Dysim's testimony as a whole shows that his opinion of the primary activities of DIM was based on conversations with other law enforcement officers and with gang members, and on a police database of crime reports. This is precisely the type of information which provides a solid basis for an expert opinion on gang activities.

Although not directly linked to his opinion on DIM's primary activities, Dysim testified about his own observations of gang graffiti, which is vandalism, one of the

11

primary activities identified by Dysim. Dysim also testified that in 2009, there was a feud between DIM and CFL and they were "taking turns" shooting at each other. Assault with a deadly weapon was another of the primary activities identified by Dysim. And, as mentioned above, Dysim testified that DIM committed robberies more than they committed shoplifting. Robberies were the third primary activity identified by Dysim. This evidence supports Dysim's expert testimony about DIM's primary activities. (See *People v. Sengpadychith, supra*, 26 Cal.4th at p. 323 [gang members past or current conduct in committing one of § 186.22, subd. (f)'s delineated crimes relevant to show primary activity].)

Appellant's reliance on *In re Alexander L.* (2007) 149 Cal.App.4th 605 to show insufficient evidence is misplaced. In that case, the expert's "entire testimony" was that "he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information. He did not directly testify that criminal activities constituted [the gang's] primary activities. Indeed, on cross-examination, [the expert] testified that the vast majority of cases connected to [the gang] that he had run across were graffiti related" which the court assumed to be misdemeanor vandalism. (*Id.* at pp. 611-612.) The court in that case concluded that the expert's opinion was not substantial evidence because "information establishing reliability was never elicited from him at trial. It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources . . . or entirely unreliable hearsay." (*Id.* at p. 612.) As we have just explained, that is not the situation here.

3. New trial motion

Appellant contends the trial court failed to apply its independent determination in ruling on appellant's motion for a new trial on the ground that the jury's verdict was contrary to the law under section 1181, subdivision (6), because there were serious credibility issues with every witness implicating appellant in the shooting. To show error, appellant relies on the trial court's remark that "as of now I believe, having listened

12

to the jury, that there was plenty of evidence and that they performed their function." Appellant has not shown error.

### a. Applicable law

"In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict. [Citation.] [¶] A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. [Citation.] (*People v. Davis* (1995) 10 Cal.4th 463, 523–524.)" (*People v. Fuiava* (2012) 53 Cal.4th 622, 729-730 [internal quotation marks omitted].)

### b. Appellant's new trial motion

Appellant's final new trial motion and supplement new trial motion alleged multiple grounds for a new trial. These grounds were intertwined. In the new trial motion, appellant alleged that (1) the court erred in allowing Almodovar to testify about an out-of-court statement by codefendant Rojas because that statement was inadmissible hearsay; (2) the photographic lineup shown to McEntire was "tainted"; (3) the jury's verdict was contrary to the law because there were serious issues of credibility with every witness; and (4) the police and prosecution committed misconduct. In section (3), appellant claimed that (a) McEntire's identification of appellant was problematic because she made conflicting statements, admitted she was influenced by her friends and was interviewed numerous times by detectives; (b) Almodovar's testimony was not credible because he delayed telling police about the conversation with Rojas until he was in

13

custody on a case of his own, there was no record of Rojas calling Almodovar on the date claimed and Almodovar inaccurately described the crime scene; and (c) Herrera's testimony was not credible because it was the product of police intimidation.

In his supplemental brief, appellant claimed (1) his trial counsel was ineffective in failing to confront and cross-examine Herrera about possible bias from his probationary status; (2) his trial counsel was ineffective in failing to challenge as suggestive McEntire's identification of appellant; and (3) appellant he had newly discovered evidence consisting of a letter from Herrera stating he was pressured into making false statements by detectives and of statements from a witness to the shooting that he saw a different gang member run from the site of the shooting.

c.  Hearing on the new trial motions

At the hearing on his motions, appellant's arguments about the sufficiency of the evidence were intermixed with his other arguments involving legal error and ineffective assistance of counsel.  The trial court's comments must be considered in this context.

Appellant began by arguing, "regarding the *Greenburger* . . . [Almodovar] didn't have the trustworthiness to actually testify."  Appellant then argued that Almodovar inaccurately described the crime scene and Almodovar's claim that Rojas went with appellant to the shooting was contradicted by other evidence and so his testimony was not trustworthy or reliable and "it shouldn't have been admitted."  Thus, appellant's argument was primarily that the court erred in deciding that Almodovar's testimony about Rojas's statement was admissible under *People v. Greenburger* (1997) 58 Cal.App.4th 298.  The court reminded appellant, "I went through a long analysis of why I did find him trustworthy."

Appellant next argued that Rojas was not allowed "to challenge what Mr. Almodovar was saying.  And *it was a failure to confront and cross-examine*, plain and simple.  [¶]  Anything else, I mean, as in regards to *ineffective assistance of counsel*, it goes to show that Mr. Herrera was on probation at the time."  Appellant explained, "And because *my lawyer did not bring that up to the jury* and argue that and show, you know,

14

that was a failure to confront and cross-examine on his behalf." Appellant then turned to McEntire, stating, "she only picked me out of a photo line-up [and] she only did that because she was influenced by her friends." Appellant argued that was a violation of his right to a fair identification and "you know, *her testimony should have been you know, . . . if not challenged*, inadmissible in itself." Appellant concluded by arguing that "there was a lot of problems here . . . regarding everything that came in . . . the sufficiency of the evidence, I mean, I don't see how it stands. [¶] If the jury would have properly heard the arguments, you know, *my lawyer would have properly, you know presented to the jury these things* that went on - -"

As can be seen, although appellant argued that the witnesses were unreliable and so the evidence insufficient, he did so primarily as part of his argument that his trial counsel was ineffective in failing to more effectively challenge the witnesses' testimony, either through argument or by cross-examination. Thus, in context, the trial court's statement that appellant's attorney "made every one of these arguments, and he made them to the jurors, and they rejected them" is most reasonably understood as a response to appellant's ineffective assistance of counsel claim.

The court also stated that "as of now I believe, having listened to the jury, that there was plenty of evidence and that they performed their function." This remark was at least in part a response to appellant's argument suggesting that the jury did not properly hear arguments about witness unreliability. ("If the jury would have properly heard these arguments. . . .") Appellant clearly understood the trial court's remark in this sense, because he replied to the court, "obviously the jury didn't completely understand what was going on."

To support his point that the jury did not completely understand what was going on, appellant added, "Because they found both of my codefendants not guilty." The court replied, "Maybe they shouldn't have." As appellant had earlier argued, Almodovar and Herrera not only testified that appellant committed the shootings, but that appellant's codefendants also participated in this crime. The court's disagreement with the not guilty

15

verdicts for the two co-defendants indicates that the court itself believed that there was sufficient evidence to support convictions for all three defendants.

"As an aspect of the presumption that judicial duty is properly performed, we presume . . . that the court knows and applies the correct statutory and case law." (*People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) "Further, remand is unnecessary if the record is silent concerning whether the trial court misunderstood its . . . discretion. Error may not be presumed from a silent record." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229.)

Considered in context, the trial court's complete remarks do not rebut the presumption that the court was aware of its duty to independently review the evidence supporting the verdict. Further, the court's final remark disagreeing with the acquittals indicate the trial court did independently review the evidence and find it sufficient.

4. Abstract of judgment

Respondent contends that trial court mischaracterized the sentence for the two attempted murder convictions as being 15 years to life for the underlying attempted murder conviction rather than the life with a minimum parole eligibility period of 15 years pursuant to section 186.22, subdivision (b)(5). Respondent contends this incorrect description is also reflected in the abstract of judgment.

The trial court correctly stated that for count 2 "the 186.22(b) allegation . . . changes your minimal eligibility for parole to 15 years." For count 3, the court again stated, "The fact that the jury found the 186.22(b) to be true changes your minimum eligible parole date to 15 years."

Respondent is correct that there is no reference to section 186.22 as the basis for the 15 years to life sentence in the abstract of judgment. Accordingly, we will order the abstract corrected to reflect the court's oral pronouncement of sentence of life.

Disposition

The abstract of judgment is ordered corrected to reflect a sentence of life with a minimum parole eligibility period of 15 years pursuant to section 186.22, subdivision (b) for the count 2 and 3 attempted murder convictions. The section 12022.53, subdivision (d) firearm enhancement remains unchanged. The clerk of the superior court is instructed to deliver a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. The judgment of conviction is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

GOODMAN, J.[*]

We concur:

TURNER, P.J.

MOSK, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17